THE STRATHLEVEN. THE MARGARET J. SANFORD. THE S 11.

(Circuit Court of Appeals, Fourth Circuit. February 4, 1914.)

No. 1183.

1. COLLISION (§ 71*)—ANCHORED VESSEL—IMPROPER ANCHORAGE.
   A vessel anchoring in a place forbidden by a local law or custom in case of collision must take the consequences of her own unlawful acts.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*]

2. COLLISION (§ 69*) — VESSELS ANCHORING IN CHANNEL — CONSTRUCTION OF STATUTE.
   Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), making it unlawful to tie up or anchor vessels in navigable chan-

nels in such manner as to prevent or obstruct the passage of other vessels, is not an absolute prohibition and is not violated by a vessel which anchors at a point in a channel where notwithstanding such anchorage other vessels, navigated with the care the situation requires, can safely pass.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

3. COLLISION (§ 71*)—STEAMSHIP ANCHORED IN CHANNEL AND PASSING VESSEL—MUTUAL FAULTS.

A collision occurred in the Elizabeth river between a steamship and a scow passing in tow. The steamship had anchored to the west of the channel, but a strong wind caused her to swing into the channel and also to drag her anchor until she obstructed three-fourths of the 800-foot channel, when the scow struck and broke her propeller. The harbor regulations prohibited anchoring in the channel. *Held*, that she was in fault, but that the towing tug, which was moving at only two miles an hour against the wind and tide, was also in fault for not stopping when the steamship was seen drifting across the channel.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. § 71.*

Collision with or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit for collision by Strathleven Steamship Company, Limited, owner of the steamship Strathleven, against the tug Margaret J. Sanford and Scow S 11, P. Sanford Ross, claimant. Decree for respondent, and libelant appeals. Modified and affirmed.

For opinion below, see 203 Fed. 331. Resettlement of costs denied in 213 Fed. 979.

Floyd Hughes, of Norfolk, Va., and R. J. M. Bullowa, of New York City (Hughes & Vandeventer, of Norfolk, Va., on the brief), for appellant.

H. H. Little, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellee.

Before PRITCHARD and WOODS, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. [1] On January 9, 1912, the scow S 11 in tow of the tug Sanford came into collision with the propeller of the steamship Strathleven and broke it off. The accident happened in the main ship channel of the Elizabeth river leading into the port of Norfolk. Some ten minutes before the vessels came together the Strathleven had dropped anchor, at a point about 100 feet west of the channel. Under the influence of wind and tide she not only began to swing, but dragged her anchor as well. As she had out 45 fathoms of chain, the result was that at the moment of the collision her stern was within 200 feet of the easternmost edge of the channel. In short, she was then occupying three-fourths of the entire 800 feet of channel width. In the court below the Strathleven was held solely in fault. Its owner has appealed. The opinion of the learned judge who sat in the District Court is reported in 203 Fed. 331. A detailed statement

of the facts by us is therefore not requisite. Nor will it be necessary to discuss at length the meaning or application of state or federal laws on the subject of anchorages. The regulations of the Harbor Commissioners in so many words forbid vessels to anchor in the channel; this prohibition impliedly extends to anchoring so as to obstruct the channel. The court below finds that neither authority nor usage has designated any specific anchorage grounds, and the implication from much that is said in the learned and elaborate opinion is that the port regulations already referred to have been but indifferently enforced or obeyed. Suffice it on this point to say that vessels anchoring in places forbidden by local law or custom must take the consequences of their own improper acts. The Clarita and the Clara, 23 Wall. 1, 23 L. Ed. 146; United States v. St. Louis Transportation Co., 184 U. S. 255, 22 Sup. Ct. 350, 46 L. Ed. 520; Culbertson v. The Southern Bell, 18 How. 586, 15 L. Ed. 493; The Annasona (D. C.) 166 Fed. 803.

[2] This court has already placed a construction upon section 15 of the Act of Congress of March 3, 1899, c. 425, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543) which declares that it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft. We have said that we did not think that Congress thereby intended absolutely to forbid anchoring in navigable waters, except only at such places as would necessarily prevent the passage of other vessels or obstruct them in passing to such an extent as to make the effort to do so a dangerous maneuver. If a vessel anchors at a point in the channel where, notwithstanding such anchorage, other vessels navigated with the care the situation requires can safely pass, then she has neither violated the statute nor rendered herself liable under the general rules applicable to navigation even though she has to a certain extent obstructed the channel. The Caldy, 153 Fed. 840, 83 C. C. A. 19. The same conclusion has been reached by the Circuit Court of Appeals of the Second and of the Ninth Circuits. The City of Birmingham, 138 Fed. 559, 71 C. C. A. 115; The Europe, 190 Fed. 478, 111 C. C. A. 307.

[3] Upon the facts of the case at bar we concur with the court below in thinking that the Strathleven was in fault. When she let go her anchor, vessels were in sight moving towards her from opposite directions. The wind was blowing 30 miles an hour; the tide was at flood. She was 350 feet long, and was light. Unless great care was used, she would swing into the channel. It was possible that before her anchor ceased to drag it would be necessary to pay out a good deal of chain. Under such circumstances, she should have selected another anchorage or adopted precautions to offset the effect of wind and tide and the possibility of a dragging anchor. We cannot, however, persuade ourselves that the tug was free from fault. It was broad daylight. All the vessels concerned were moving very slowly, the Sanford not over two miles an hour. That the Strathleven was coming to anchor must have been apparent to the tug for many minutes before the collision. That she was swinging around was obvious.

213 F.—62

That she was visibly dragging back on her anchor is testified to by the master of the tug.

It matters not how gross the fault of the Strathleven was, the Sanford was not absolved from the use of such precautions as good judgment and accomplished seamanship required. The Albert Dunois, 177 U. S. 249, 20 Sup. Ct. 595, 44 L. Ed. 751. She was approaching a vessel, whose movements must to her have seemed uncertain, as in fact they were. If she could not for any reason so change her course as to carry her out of the possibility of a collision, she should have stopped if she could have done so with safety to herself and to her tow. The New York, 175 U. S. 201, 20 Sup. Ct. 67, 44 L. Ed. 126. Moving as slowly as she was, in the teeth of so strong a wind and with the tide running against her, stopping was both safe and easy.

The learned judge below said that the effect of stopping would have been uncertain. In coming to this conclusion he has apparently lost sight of the testimony of the master of the tug that he could have stopped without danger, and would have done so had the tide not been at ebb. There is no question but that the tide was flood. The court so finds. Ignorance by a navigator of the state of the tide in waters to which he is accustomed is inexcusable. "For * * * it his vessel must answer." The John H. May (D. C.) 52 Fed. 884. We appreciate that the efforts of the tug to carry its tow safely by the stem of the Strathleven were embarrassed by the approach of the Maryland and the proximity of the dredge stakes, all of which conditions are fully discussed in the opinion below. None of these things tended to make stopping difficult. The master of the tug did not stop because he thought the tide was running in the opposite direction from that in which it was and because as he testified, "We cannot stop for everything that comes along; we would never get to any place." The Supreme Court has said the "lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn; but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect." The New York, 175 U. S. 204, 20 Sup. Ct. 75, 44 L. Ed. 126. There are still navigators who have not mastered it.

It follows that the case must be remanded, with directions to modify the decree so as to adjudge both the Strathleven and the Sanford in fault and to provide that the damages and the costs below shall be divided equally between them. The appellee must pay the costs in this court.

Modified and affirmed.