## THE CITY OF NORFOLK.

### THE HAWKHEAD.

(District Court, E. D. Virginia.   December 21, 1917.)

1. COLLISION ⬤⟳69—ANCHORING IN CHANNEL.
    A large and heavily laden ocean-going steamship, which had left her pier and started down the Elizabeth river for the sea in the evening, *held* not in fault for anchoring in the eastern side of the channel when she encountered a thick fog, which in the opinion of both her local pilot and her master rendered it dangerous to proceed; there being at least 200 feet between her and the west side of the 30-foot channel, which was ample depth for such vessels as were navigating the river at the time; the pilot being given reasonable discretion in such matter by Code Va. 1904, § 1965, as amended by Acts Va. 1908, c. 120.

2. COLLISION ⬤⟳82(1)—MOVING AND ANCHORED VESSELS—EXCESSIVE SPEED IN FOG.
    A steamer passing down the Elizabeth river in the evening in a dense fog, because of excessive speed and the negligence of her lookout, *held* solely in fault for collision with a steamship, which had anchored at one side of the channel because of the fog and was regularly sounding her fog bell, which was heard on the moving steamer at a distance of half a mile, and showing proper lights, which were seen when 200 feet away.

In Admiralty.   Suit and cross-suit for collision between the steamships City of Norfolk and Hawkhead.   Decree in favor of the Hawkhead.

Hughes & Vandeventer, of Norfolk, Va., for the City of Norfolk.
Hughes, Little & Seawell, of Norfolk, Va., for the Hawkhead.

WADDILL, District Judge.   This proceeding involves a collision between the steamship City of Norfolk and the British steamship Hawkhead, which occurred in the Elizabeth river, between Boush Bluff and the Virginian Railway piers at Sewell's Point, on the evening of October 6, 1916, at 6 minutes after 7 oclock.   The City of Norfolk was a passenger and freight steamer of the Chesapeake Line, 297 feet 5 inches long, 46 feet beam, and 16 feet 2 inches deep; and the Hawkhead, a large British steamship, of 4,622 tons gross, 385 feet long, 56 feet 6 inches beam, and 26 feet 5 inches deep.

The case of the City of Norfolk is that on the evening in question she left Norfolk en route for Baltimore, and while proceeding down the Elizabeth river, between Craney Island Light and Boush Bluff Lightship, she encountered fog, and thereupon rang down to half speed, and sounded her fog signals at regular and lawful intervals. The fog becoming denser, she slowed down, and proceeded thence with only sufficient speed to keep her steerage way.   Her navigators at the time could see the gas buoys on the port hand of the channel.   The fog becoming thicker, her engines were stopped, and she drifted with the ebb tide under a little headway, and, whilst so navigating, a steamship, which afterwards proved to be the Hawkhead, was observed and reported close aboard, directly ahead, at anchor, and with which the City

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of Norfolk collided, striking her on the starboard side aft of amidships. The collision occurred in the Boush Bluff Channel, a little below Gas Buoy 12a, and to the westward of mid-channel.

The Hawkhead's case, briefly, is that she left Lambert's Point pier about 5:30 that evening, in charge of a Virginia pilot, bound for sea, and about 6 o'clock ran into a thick fog and came to anchor at high water, on a 15-fathom chain, in the vicinity of Gas Buoy 12a, on the eastern side of the channel, partly within and partly without the same, and, with the turn of the tide, tailed slightly down the river, and across the channel; that, when she came to anchor at the place named, the fog had become so dense that in the estimation of her pilot, in which the ship's master concurred, it was impracticable either to return to Lambert's Point or to proceed to the anchorage grounds by and below Sewell's Point, and, indeed, to navigate at all. She at once set up her regulation anchor lights, fore and aft, which were burning brightly both before and after the collision, properly stationed her anchor watch, and fog signals were duly sounded. After coming to anchor, the chief officer and lookout remained on the forecastle head, and the master, third officer, and the Virginia pilot were on the bridge. While thus at rest, shortly after 7 o'clock, she heard several fog signals from a steamer under way, coming down the river, and almost immediately the City of Norfolk, approaching at a high rate of speed, loomed up about four points on the Hawkhead's starboard bow, showing her starboard and masthead lights, and swung into the starboard side of the Hawkhead abaft the beam.

Both vessels make charges of negligence one against the other; the City of Norfolk that the Hawkhead was unlawfully anchored in a narrow channel in thick weather, that she let herself so drift as to almost entirely obstruct the channel, and, being in this condition, failed to have properly set and burning her lawful lights, or to sound lawful and proper fog signals, and also failed to give signals indicating her presence in the channel, and failed to maintain an efficient watch.

The Hawkhead charges negligence on the part of the City of Norfolk in attempting to navigate in a thick fog; for proceeding at an unsafe speed; for failing to keep a sufficient and proper lookout, and to keep out of the way of the Hawkhead, a vessel at anchor; and likewise for not having a competent officer in charge of her navigation; also for reversing her engines when close aboard the Hawkhead, causing the City of Norfolk's bow to sheer to starboard, and collide with the Hawkhead.

From this statement of the case, and the averments of negligence by the parties one against the other, it will be necessary for the court to determine, first, whether the Hawkhead was lawfully anchored within the channel; and, secondly, if so, whose negligence brought about the collision.

The first question is largely one of law. The second depends upon a full consideration of the testimony, as to which there is a sharp conflict, especially as regards the navigation of the City of Norfolk at and about the time of the collision, and whether the Hawkhead had and maintained proper anchor lights, and was giving the proper fog signals.

[1] First. Considering the question of the anchorage of the Hawkhead, the court's conclusion is that she had the right to anchor where she did. She would undoubtedly have had such right, day or night, in the absence of fog; it having been determined in this district, since the passage of the act of March 3, 1899, that it was not the purpose of said act to forbid anchoring in navigable waters, except only at such places as would necessarily prevent the passage of other vessels, or so obstruct their passing as to make the effort so to do a dangerous maneuver, and that vessels anchoring in the channel, where, notwithstanding such anchorage, other vessels, navigating with the care the situation required, could safely pass, neither violated the statute, nor rendered themselves liable, under the general rules applicable to navigation, although to some extent such channel might be obstructed. The Caldy, 153 Fed. 837, 83 C. C. A. 19; The Strathleven, 213 Fed. 975, 977, 130 C. C. A. 381. It will hardly be seriously contended, if it became necessary for a vessel to come to anchor in a fog, that she would have less rights respecting a place of anchorage than at other times, provided proper lights were set and burning, and appropriate fog signals given. At the place in question the 35-foot deep water channel was 400 feet wide, and the 30-foot channel 600 feet wide; and the consensus of the testimony was that certainly as much as from 75 to 100 feet of the deep water or 35-foot channel, on its westward side, was open, and the 30-foot channel extended considerably more than 100 feet to the westward of the line of the deep water channel at the scene of the collision. Other shipping passed to and fro along the western edge of the deep water channel, two vessels abreast in one instance, and large ships passed in the 30-foot portion of the channel to the westward of the deep water channel, none of them being in any manner affected by the presence of the Hawkhead; in fact, there was ample depth of water for all of the vessels passing up and down the harbor, at about the time of the collision, for the space of at least 200 feet, and perhaps 250 feet, away from the stern of the Hawkhead.

The Hawkhead was a large and heavily laden ocean-going ship, and, encountering dense fog, attempted to return to the anchorage grounds at Lambert's Point, and, in the judgment of her pilot, found it dangerous to do so, or to continue her navigation down the river by the Virginian Railway piers, and across the channel to the anchorage grounds some mile and a half below. Thereupon her navigators, as a matter of safety, concluded to anchor to the eastern side of the channel, a distance of some mile or more above, and south of the Sewell's Point pier. The ship was of deep draft, in a busy harbor, at an hour for the passage of much shipping, and she could have proceeded with safety, if at all, only by the exercise of the utmost prudence, and it was undoubtedly the wiser course to anchor while she could do so, without danger to herself or other vessels navigating with care. In the opinion of the court, under the existing conditions, she was warranted in coming to anchor when and where she did, and there was no danger reasonably to be anticipated from her so doing, to other vessels themselves conforming to the rules of navigation in a fog. Undoubtedly, if the Hawkhead alone came to anchor in a fog, and other shipping proceeded

regardless of its existence, then necessarily a dangerous condition would arise, but one for which she would not be responsible. Moreover, the Hawkhead was in charge of a licensed pilot, in whom was vested discretion as to the ship's movements, and on the occasion in question, both his judgment and that of the experienced master of the ship concurred in what was the safe course to adopt, in the position in which they found themselves; and the court sees no reason why the ship should be held liable for the exercise of this discretionary act on their part. Code Va., § 1965, as amended by Acts 1908, p. 147, is as follows:

"Sec. 1965. *What Vessels to Take Pilots and Where.*—The master of every vessel, other than vessels exclusively engaged in the coastwise trade and those made exempt by United States statutes, inward bound from sea, shall take the first Virginia pilot that offers his services, Cape Henry bearing west of south. to Smith's Point, Yorktown, Newport News, or Norfolk, or any intermediate point; and any such vessel, outward bound, shall take the first Virginia pilot that offers his services at Smith's Point, Yorktown, Newport News, or Norfolk, or any intermediate point to sea; and any master refusing to do so shall immediately pay to the said pilot full pilotage from the sea to Newport News, Smith's Point, Yorktown, or Norfolk, or from said ports to the sea, as the case may be: * * * provided further, that after a licensed Virginia pilot shall have offered his services to any vessel subject to the provisions of this chapter (or whose services shall have been voluntarily required), such pilot shall have full discretion as to when such vessel shall be piloted to or from sea or to or from any port or place within the state, and shall not be interfered with by the master or any other person, but such pilot's discretion shall be exercised in a reasonable way, with a view to the vessel's safety."

See Revised Statutes, § 4235 (Comp. St. 1916, § 7981); Steamship v. Joliffe, 2 Wall. 459, 460, 17·L. Ed. 805; Atlee v. Steam Packet Co., 21 Wall. 389, 22 L. Ed. 619; The A. P. Skidmore, 115 Fed. 791, 53 C. C. A. 287; The Newburgh, 130 Fed. 331, 64 C. C. A. 567.

[2] Second. This brings us to the consideration of the City of Norfolk's navigation at the time of the collision, and whether the Hawkhead, after coming to anchor, properly observed the rules of navigation prescribed for vessels at anchor. As to each of these questions, there is a sharp conflict in the testimony. There was an unusual number of witnesses examined, particularly from passing vessels, some three or more steamers having passed up, and a like number down, the harbor, during the existence of the fog, and shortly before and about the time of the collision; and there is a unanimity of opinion as to the presence of a heavy fog extending from below Thimble Light to a point between Boush Bluff and Craney Island Light, and of unusual density about the scene, and at the time of the collision; and the court could but be impressed with the fact that, with the exception of the Hawkhead, but little time was lost by moving shipping as a result of the fog. It is true, none of the steamers admitted violating any rule of navigation regarding their speed and movements; still the loss of time during the presence of the fog, and certainly the inconvenience to shipping, and delay consequent upon the prevalence of thick weather, was not very apparent. The inward bound vessels, in several instances, took occasion to hail those going out, and admonished them of the

presence of the anchored ship, but for which, most probably, some steamer thus fortunately warned would have shared the fate of the City of Norfolk,

The City of Norfolk insists that she was in all respects complying with the law and rules of navigation, and that she had reversed her engines, and was merely drifting with the tide, when the two ships came together, having no more headway than was sufficient to control her movement. This statement is directly contradicted by the Hawkhead, and the conflict with respect thereto is sharply drawn. The court is convinced that the testimony does not support the City of Norfolk's contention as to her speed. The collision would not have occurred, had she been navigating as insisted upon by her; and certainly, with a stationary vessel, no such result would have followed as took place. It could have been easily avoided by proper navigation, after the presence of the Hawkhead was or should have been discovered. The weather was calm, and there was nothing in existing conditions to have prevented the two vessels from observing each other, and the moving vessel from clearing the anchored vessel.

A careful consideration of all the testimony, specially that of the navigating officers of the City of Norfolk, and the passenger thereon, himself an experienced pilot, indisputably shows that the fog bell of the Hawkhead was heard on the City of Norfolk at a distance of certainly half a mile, and that the lights of the Hawkhead were observed at least 200 feet away. It is true the navigators of the City of Norfolk insist that the bell they heard was not from the Hawkhead, but that will not do. It was undoubtedly from that vessel, as testified to by the disinterested witness on the City of Norfolk, and no other bells have been shown to have been ringing in the immediate location of the collision. Besides, hearing a bell ahead was sufficient to warn those navigating the City of Norfolk to avoid colliding with the vessel from which the sound proceeded. It gave warning of the presence of a vessel at anchor, as a moving vessel should have been sounding a prolonged blast of its whistle in fog. In the latter case, so high a decree of care was not required, since to some extent the vessel could escape danger, as it might be moving away, unless the whistle indicated its approach; whereas, the bell gave notice of a stationary object in the water, one entirely helpless, save as protected from danger by navigators themselves respecting and observing the warnings afforded by her rules of navigation.

The mere presence of fog of the density then existing should have admonished and warned the City of Norfolk that in going down a narrow and much frequented channel, especially at that time of the evening, when incoming and outgoing local steamers were due to be passing, they should have proceeded, if at all, with the utmost care, and they had no right to anticipate that prudent navigators would not lay to, if necessary, or, if proceeding at all, would comply with the rules of navigation, and proceed at such a rate of speed, that they would be quickly overtaken by one not conforming to the requirements of the laws and regulations governing their speed. Rule XVI of the Navigation Laws is as follows:

"Every [steam] vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions. A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained, shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over." Comp. St. 1916, § 7854.

The light from the Hawkhead was seen certainly 200 feet away, and the loom of the ship about the same time; and had the City of Norfolk been proceeding only at the moderate speed required, having careful regard to the existing circumstances and conditions, she would have been afforded ample time to have avoided coming into collision with the stationary object.

From all the testimony, the court is convinced that the lookout on the City of Norfolk, was grossly negligent in not hearing and reporting the fog bell sounded from the Hawkhead earlier than he did, and that the City of Norfolk was proceeding at undue speed, in utter disregard of the law and regulations prescribed for the control of her movements in fog. Those on the Hawkhead so testified; one of the passengers on the City of Norfolk so affirmed; and the time taken to cover the distance from the vessel's entering the fog to the scene of the collision gives strong support to the claim. Had she not been so running, the reversing of her propeller would have thrown her head to starboard; and it is entirely clear that, with the Hawkhead at rest and the City of Norfolk proceeding as claimed by her, she would not have come into and cut through the steel plates and into the structural part of the Hawkhead, at the angle she did, for a distance of 5½ feet. Authorities to sustain the views herein expressed might be given almost without number, and only a few need be cited: The Pennsylvania, 19 Wall. 125, 22 L. Ed. 148; The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The Umbria, 166 U. S. 404, 417, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Bayonne, 213 Fed. 216, 129 C. C. A. 560; The Julia Lackenbach—The Indraquala (D. C.) 219 Fed. 600, affirmed 239 Fed. 94, 152 C. C. A. 144; The Otter, Law Rep. 4 Ad. & Ec. 203, 206; The Lancashire, 4 Ad. & Ec. 198, 201.

Considering the conduct of the Hawkhead, after coming to anchor; that is, whether she had up and burning her proper anchor lights, and was sounding her proper regulation fog signal, the evidence in this respect seems conclusively to establish her contention, and to exonerate her from fault in the respects mentioned. Those testifying for the ship, including the pilot, sustain this view, and their testimony is entitled to much weight, as they were in the best position to know, see, and hear what took place; and besides, it is highly improbable that, under the circumstances in which the ship came to anchor, they would have omitted any of these usual and necessary precautions, required alike for the vessel's safety and their own protection. Moreover, the testimony from a number of witnesses, including some examined from the City of Norfolk, is to the effect that fog bells were heard, which the City of Norfolk attributes to other shipping anchored in the vicinity; but just why this should be done is not ap-

parent, as it is evident that the Hawkhead, whatever the others were doing, was sounding the regulation fog signals, which were heard, and that the collision ought not to have occurred, had those navigating the City of Norfolk been engaged in the proper navigation of their ship at and about the time of the collision.

It follows, from what has been said, that the collision resulted solely as a result of the negligence of the City of Norfolk, and a decree will be entered, on presentation, so ascertaining.