THE NORMAN B. REAM. THE SENATOR. WOLVERINE S. S. CO. v. PITTSBURGH S. S. CO.

(Circuit Court of Appeals, Seventh Circuit. May 16, 1918.)

No. 2376.

1. COLLISION ⬥98—NEGLIGENCE—DISREGARDING SIGNALS.

A ship which was proceeding down St. Mary's river at full speed, and which collided with another vessel attempting to turn in the river, *held* at fault, because disregarding refusal of the second vessel to consent to

passage; this being so, both without regard to the same and under rules 23 and 26 of the White Law, and pilot rules 1 to 4.

2. COLLISION ⬮⮞92—PASSING VESSEL—STARBOARD HAND RULE.

Where vessel leaving its berth in a river was proceeding directly across the course of one coming downstream for the purpose of turning down stream, *held* that, while the starboard hand rule was inapplicable, the rule for passing agreement by signal, or for checking or stopping in lieu thereof, is applicable.

3. COLLISION ⬮⮞102—LIABILITY—VESSELS AT FAULT.

Where a steamer coming down St. Mary's river and one which was turning after leaving its berth collided, *held* that, though the steamer coming down was at fault in disregarding the one turning, the vessel turning was also at fault in crossing the course of the other.

4. COLLISION ⬮⮞20—LIABILITY—LAST CLEAR CHANCE RULE.

The last clear chance rule is not applicable in collision cases.

5. COLLISION ⬮⮞144—DAMAGES—DIVISION.

Where both vessels which collided were at fault, the liability must be divided.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

In Admiralty. Libel by the Wolverine Steamship Company against the steamer Norman B. Ream, together with cross-libel by the Pittsburgh Steamship Company against the steamer Senator. From a decree dismissing the libel, and awarding damages to the cross-libelant, the libelant appeals. Reversed and remanded for further proceedings.

Harvey D. Goulder and Frank S. Masten, both of Cleveland, Ohio, for appellant.

H. A. Kelley, of Cleveland, Ohio, for appellee.

Before BAKER, MACK, and ALSCHULER, Circuit Judges.

MACK, Circuit Judge. On libel and cross-libel for damages growing out of a collision, the District Court dismissed the libel, and, finding the Senator solely at fault, awarded $10,238.81, with interest, as damages to cross-libelant, owner of the Norman B. Ream. The Senator claimed damages of $110,000; the Ream, something over $10,000.

The testimony, taken by deposition, established that the Senator, a steamer with a keel length of about 410 feet, laden with ore, was proceeding down St. Mary's river at full speed, about 11¾ miles an hour, on a clear summer morning, somewhat outside the sailing line marked on the government's charts between the American mainland on the westerly side and Pipe Island, about three-quarters of a mile out. The Ream, whose keel length is 580 feet, had left a coal dock (which is on the American mainland about 3,300 feet west of the sailing line), intending to wind about and also to proceed downstream. As the Senator was making a bend about Sweet's Point light, a little below the bend in the charted course, her master had observed the Ream lying at the dock. His view of her was obscured for a time by the trees on Sweet Island; when he next observed her, she appeared to him to be heading upstream in the direction of Sweet's Point light. At this time, when the Senator claims to have sounded her first two-blast signal, the vessels are testified by the Senator's captain to have been about

a mile apart; the distance, however, would seem to be nearer two miles.

The master of the Ream saw the Senator headed downstream before he left his anchorage at the dock. There she lay, bow upstream. To avoid a shoal above and to facilitate her turn, she backed, on leaving the dock, until she was abreast its southeast corner. Thereupon she went ahead under checked sped until her stern had cleared the northwest corner of the dock; then she proceeded full speed ahead under a hard aport helm. It was her intention to round to and go down the river, but when she had progressed about half the distance out to the sailing course, her master, discovering she was not swinging to starboard as she should, sent his mate, who was amidship, aft to see what was wrong with the steering gear. At the same time, and, as the Ream's captain and crew testify, before any signal from the Senator was heard, the engines were backed full speed astern for the twofold purpose of stopping her headway and of accelerating her turn, by throwing her stern to port and her bow to starboard. Her engines were kept rung up full sped until after the collision.

The first two-blast signal, which the Senator's captain and crew testify was sounded when the boats were a mile apart, was not heard by the Ream. A similar second signal, the first heard by the Ream, was sounded shortly after her engines were reversed. The distance between the two vessels at that time is variously estimated by the witnesses between a quarter of a mile to a mile or more; the testimony satisfies us that it was not less than three-quarters of a mile. The double blast was immediately answered by an alarm of several short, sharp blasts from the Ream. The Senator replied with another two blasts; the Ream rejoined with another warning alarm. By this time the vessels had approached within about a quarter of a mile of each other. The master of the Senator testified that, on hearing the first alarm of the Ream, the Senator immediately hard astarboarded, swinging, in his judgment, almost two points to port; that, when the bow of the Senator had cleared the Ream, the Senator hard aported, in order to cut her stern to port and away from the Ream; that he thus overcame in less than 250 feet the swing to port and swung a point to starboard. His attempt to dodge the Ream failed, however, and she struck his boat about 48 feet abaft amidships. He further testified that he knew from the danger signals that there was something wrong, and believed the signals to indicate that the Ream's captain considered his proposed crossing of her bow dangerous and wanted him to keep clear; that he kept on full speed for two or three minutes, though he had not obtained the requested passing agreement; that, under the rules, he knew he should have backed or checked.

According to the Ream's testimony, by the continuous backing of her engine at full speed, she had overcome her headway at the time of the collision, and, if moving at all, was going astern. On the one hand, it is contended that the Ream, by virtue of her own headway, ran into the side of the Senator; on the other, either that she was drawn in by the suction of the vessel crossing her bow full speed, or that, after the Senator's bow had cleared the Ream, her stern, still

under the influence of the hard astarboarding, continued to cut to starboard and swing towards and against the stern of the Ream.

Subsequent investigation disclosed that a leather in one of the cylinders of the telemotor had become spongy and tipped back, thus preventing the oil in the tube connecting the pilot house and the gear aft from being forced one way or another, with the result that the steering engine could exert no control over the rudder. The engineer, who had fitted the boat out that spring, inspected the telemotor very carefully, installed new leathers in the engine room, examined the leathers in the pilot house, charged the telemotor with oil, and tried it out thoroughly. The engineer in charge at the time of the accident testified that the ordinary life of leather is three to five years, and that the ordinary engineering practice is to examine the leathers and replace the defective or worn ones in the spring of each year; but it is not usual to inspect the leathers during the season. He had made on each trip the usual inspection of the chains, engine bearings, and packing. He had experienced no trouble with the steering gear since he had taken charge at the beginning of the year. The master of the Ream testified on cross-examination that he did suspect something wrong when he sent the mate aft to examine the steering, because it frequently acted that way; but he also said that he did not think anything was dead wrong, or he would not have left the dock.

[1, 2] The trial judge in his opinion states that:

"The facts—first, that the Senator understood the Ream's signals to be alarms in response to passing signals; secondly, that, in spite of such understanding, she continued at full speed—would seem to make out a case of negligence in navigation, no matter what formal express rules or regulations might be applicable to the situation. Her navigator concedes the possession of information from the Ream which showed her intention to call him to respect —for some cause—a situation of danger or helplessness, crippling her possible movements to avoid collision. That, in substance, is his own interpretation of the attendant circumstances. No matter what the rules may have been, prudence required him as master of the Senator to take the step of reducing speed as the obvious and primary requisite of control in the certain closer approach to the vessel which had sounded successive alarms."

He further held rules 23 and 26 of the White Law (Act Feb. 8, 1895, c. 64, § 1, 28 Stat. 649 [Comp. St. 1916, §§ 7933, 7936]) and rules 1 to 4 of the Pilot Rules, promulgated by the Steamship Inspection Service applicable; that the Senator having signaled that he was directing his course to port, and the Ream having signaled her nonassent, or her view that it was injudicious, the Senator violated his duty to slow down or stop. He further held the special circumstance rules (27 and 28 of the White Law, 13 of the Pilot Rules) inapplicable. We quote from his opinion on this point:

"That is what it purports to be—a rule of exemption from obligation to observe the general rules, because of special circumstances. It does not authorize compliance or noncompliance to rest in choice. Nor can an inexcusable failure to observe the general rules convert the situation brought about by such failure into one of 'special circumstances.' Such interpretation would make observance of the general rules practically optional, and would turn the result of nonobservance into a circumstance which would absolve the navigator from fault. The terms of such rule permit departure, rendered

necessary by special circumstances, in order to avoid immediate danger; and they do not permit departure which, without the special circumstance, promotes danger."

He adds:

"If, therefore, we give to these rules the force to which they are plainly entitled, there is nothing in the evidence that suggests that—initially—there was any extremity justifying the Senator's disregard of the obligation to check her speed when the Ream's alarm was sounded; nor is there any suggestion that, prior to the collision, any circumstance of extremity tending to produce a collision had developed, except such as was promoted by such disregard of the rules. On the contrary, a fair view of the evidence suggests but one explanation, viz. that the master of the Senator chose to take his chances to cross the Ream's bow, rather than to check or stop in obedience to the alarm signals. It seems like a plain case of 'indulging' a 'discretion in respect of obeying or departing from the rules.' Chase v. Belden, 150 U. S. 698 [14 Sup. Ct. 264, 37 L. Ed. 1218]."

We add only that, especially in view of the failure to establish a custom of steamers leaving this dock, to make the turn within the sailing line, the Senator, regardless of the rules, had no right to proceed full speed, in view of the danger signals, and in reliance upon the Ream making the turn within the inner waters. Moreover, in view of the angle of collision, which in our judgment, was not more than 45 degrees from astern of the Senator, it seems clear that, if the Senator had checked his speed even slightly, the Ream would have completed her turn without collision. Furthermore, it is immaterial that the Ream's captain did not expect the Senator to stop or check, but to go as he pleased, either to starboard or port, for he certainly expected him to keep far enough away to avoid collision. The danger signals gave the Senator due notice of his duty both under and irrespective of the rules; this he clearly disregarded.

The John Rugge, 234 Fed. 861, 148 C. C. A. 459, and cases therein cited are not applicable to the situation here presented. Concededly, the starboard hand rule does not apply where one of the vessels is not on a definite course; but neither reason nor authority makes the rule for passing agreement by signal or for checking or stopping in lieu thereof, inapplicable, when, as here, the Ream was leaving the dock in full view of the Senator, and was proceeding directly across the latter's course, though with the known purpose of turning downstream.

[3] We are, however, unable to concur in the conclusion of the trial judge that the Senator's faulty action was the sole proximate cause of the collision, and that the Ream's failure more promptly to stop her headway is not in any way in proximate culpable relation to it. Assuming that no negligence is to be attributed to the Ream, because of the failure to discover the condition of the telemotor; assuming, too, that if there were such negligence it did not contribute to the collision, because, by promptly backing the engines on discovering that the rudder would not work, the Ream swung even more quickly toward starboard than would have been possible under a hard aport wheel—nevertheless, in our judgment, the Ream was negligent in proceeding out as she did.

While, as before stated, there was no invariable custom to make the turn downstream the five-eighths of a mile of water between the

dock and sailing line, this procedure was quite usual. The Ream, of course, was not bound to lie in dock until the route was absolutely clear; but, on the other hand, with the Senator in full view and another small steamer closely on his starboard, she was bound to exercise ordinary care in navigation so as to avoid crossing their course. Going straight forward full steam on a hard aport helm necessarily, however, gave her such headway that she was at least halfway out and probably still nearer the sailing line when she attempted to reverse. This headway, she ought to have known, could not be overcome until she had passed the sailing line; even there at the point of collision, she probably still had a slight headway. Her master clearly, but erroneously, believed and acted upon the assumption that, because of the starboard hand rule, or for some other undisclosed reason, his was the privileged vessel; he assumed that by the danger signal he had cast upon the Senator the sole responsibility so to act as to avoid danger.

[4, 5] In our judgment, this negligence of the Ream directly contributed to the collision; it was a proximate cause, the effect of which, a continuous headway, directly co-operated with the Senator's full speed to produce the damage; the liability to share therein cannot be escaped because the Senator, by checking after the first alarm, might have averted collision, whereas at that time it was too late for the Ream further to overcome her headway. This is not a case for the "last clear chance" rule; moreover, that rule, in mitigation of the common-law principle that makes even the slightest contributory negligence a bar to recovery, is not applicable in this country in admiralty, where contributory negligence effects only a division of liability. The Steam Dredge, 134 Fed. 161, 67 C. C. A. 67, 69 L. R. A. 293. See, too, The Pocohuntas (D. C.) 217 Fed. 135; The Strathleven, 213 Fed. 975, 130 C. C. A. 381. See Marsden, Collision (6th Ed.) page 21.

Each captain displayed a reckless obstinacy and disregard of the other's rights. We express no opinion on the extent of the damages which must be divided equally between the parties. What part, if any, was occasioned by the alleged later negligence of the Senator, must first be determined in the district court.

The decree will be reversed, and the cause remanded, for further proceedings in accordance with the views herein expressed.

⬦⫶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes