THE DEL–MAR–VA.

BROOKS v. UNITED STATES.

THE L. S. T. 389.

UNITED STATES v. THE DEL–MAR–VA
et al.

Nos. 6843, 6852.

District Court, E. D. Virginia.

Sept. 12, 1944.

Vandeventer & Black, of Norfolk, Va., and Leonard J. Matteson, of New York City, for J. H. Brooks, master of The Del-Mar-Va, The Del-Mar-Va, J. H. Brooks, and Virginia Ferry Corporation.

Arnold W. Knauth, Sp. Asst. to Atty. Gen., and Harry H. Holt, Jr., U. S. Atty., and Russell T. Bradford, Asst. U. S. Atty., both of Norfolk, Va., for the United States.

WYCHE, District Judge (sitting by designation).

These cases are before me upon the motion of the United States for a "re-trial de novo," and if such motion is denied, to re-open the cases so that the testimony of certain witnesses, who were not offered by the government at the trial of the causes, may now be taken.

The record discloses that these cases involve a collision between the Ferry Steamer Del-Mar-Va, and a landing barge, the L.S.T. 389, owned by the United States, which occurred on December 10, 1942, in a dense fog, while the Del-Mar-Va was proceeding from Cape Charles to Little Creek, Virginia. Suit was filed by J. H. Brooks, Master of the Ferry Steamer Del-Mar-Va, against the United States, as owner of the L.S.T. 389, and a cross libel was filed by the United States against the Del-Mar-Va. The two cases were consolidated, and at the calling of the docket were, without objection, set for trial on July 26, 1943. No request or motion was made by proctors for the government at any time before the trial, or during the trial, for a continuance. Depositions of the witnesses Carpenter and Murphy, members of the crew of L.S.T. 389, and acting as two of its navigation officers, were taken by the government on April 2, 1943. The cases were tried before the late lamented Judge Luther B. Way on July 26, 28, and 29, 1943. Mr. Arnold W. Knauth and Mr. Russell T. Bradford appeared as proctors for the government, and Mr. Braden Vandeventer, Mr. W. C. Coupland and Mr. L. J. Matteson appeared for the Del-Mar-Va. At the conclusion of the evidence proctors for the parties closed the cases as shown by the following: "The Court: Have you any other witnesses, Mr. Knauth?

"Mr. Knauth: No, sir, that is our case.

"The Court: Mr. Vandeventer?

"Mr. Vandeventer: That is all.

"The Court: Both sides close."

The causes were then argued orally by proctors for the parties, after which Judge Way, in an oral decision, decided that the Del-Mar-Va was at fault for proceeding too fast in the fog, and the L.S.T. 389 was at fault for anchoring in the channel. He requested proctors to file briefs on the question as to whether or not the L.S.T. 389 was properly ringing a fog bell, and if the bell were ringing, whether that fact would relieve the L.S.T. 389 from liability. Accordingly, briefs were filed on these two questions, and on September 14, 1943, Judge Way, supplementing his oral decision, filed, what he described as an "informal memorandum,"[1] deciding that both ves-

---

[1] "Supplementing its decision heretofore announced orally, the Court files the following informal memorandum in order that counsel may have in writing the substance of its views and conclusions upon the major issues in these causes:

"(1) On the occasion in question, to-wit, December 10, 1942, the invasion barge L.S.T. 389 was moored in the westerly half, near the center, of the channel leading from the Thimble Shoals or Cape Henry Channel, to the Little Creek Terminals of the Pennsylvania Railroad and the Ferry slip. In addition to the positive testimony of numerous witnesses, some of whom appear to be disinterested, that the

sels were at fault, the Del-Mar-Va for proceeding at an excessive rate of speed in the fog, and the L.S.T. 389 for anchoring in a much traveled channel, and for not properly ringing its fog bell in accordance with the rules. Each vessel was held liable for half of the damages. Counsel for the parties were directed by Judge Way to submit more comprehensive findings of fact and appropriate conclusions of law in accord-

Barge 389 was moored in the channel, the circumstance disclosed by the evidence of both sides, that three vessels manned by competent crews, all of whom were thoroughly familiar with the channel and the waters in that vicinity, encountered the Barge 389 the same morning in the channel, is convincing as to where it was moored. The vessels referred to are the Del-Mar-Va, which collided with the Barge 389, and the tugs Norfolk and Parksley, each of which almost collided with it. The members of these crews were positive in their testimony to the effect that the barge was in the channel. None of the three vessels was off the regular course which it travelled daily, most of the time several times a day.

"(2) The Court finds that the Del-Mar-Va at the time of and before the collision, was proceeding through the dense fog that then prevailed, and had prevailed for some time before, at an excessive rate of speed. The lookout on the Del-Mar-Va testified, in substance, in answer to questions propounded to him by the Court, that the fog was so dense that to the best of his judgment he could not see farther ahead than about 40 feet. At the speed the Del-Mar-Va was then proceeding the vessel could not have been stopped or her course altered sufficiently to avoid colliding with the Barge 389, in less than several times the distance which the lookout could see ahead of the Del-Mar-Va. Shortly before the barge was seen, the Del-Mar-Va was undoubtedly proceeding at a speed of 10 to 12 miles per hour and no substantial part of this speed had been killed at the time the lookout first saw the barge. The effect of both wind and tide on the Del-Mar-Va was negligible and neither, to any appreciable extent, increased the difficulty of the Del-Mar-Va in maintaining steerage. It is the view of the Court that the relatively slight damage to the two vessels is explained in the evidence. The L.S.T. 389 is an invasion barge. It was down by the stern, light and high at its bow. The Del-Mar-Va struck the barge on the port side thereof, just aft its stem. Due to the fact that the tide was about dead slack and there was no wind, the barge was slack on its anchor chain and merely floating around so that when the Del-Mar-Va collided with it, the effect of the latter's momentum was to push the barge ahead rather than crush it and also more severely damage the Del-Mar-Va. In other words, under these conditions, the resistance of the Barge 389 to the force of the Del-Mar-Va was at a minimum.

"(3) After a careful reading and reconsideration of the testimony of the crews of the tugs Norfolk and Parksley and of Lts. Carpenter and Murphy of the Barge 389, and a review of the testimony of the members of the crew of the Del-Mar-Va, the Court has concluded, and so finds, that the Barge 389 was not giving proper or adequate signals to warn other vessels of its presence in the channel in the fog. It is true that Captain Davis and Mate Hudgins, of the tug Parksley, testified that they heard a bell on what was undoubtedly the L.S.T. 389. At the time they heard the bell the Parksley, according to their estimates, was not over 100 to 125 feet from the barge. They saw the light on the barge immediately before they heard the bell, or at the latest, simultaneously with hearing the bell. That occurred about 6:35 or 6:40 A.M., approximately 40 minutes before the collision. At the rate the tug Parksley was proceeding, if the barge was regularly giving signals as required by the rules, there is no reason apparent why the captain and mate of the tug Parksley should not have heard those signals at least three to five times before they heard the one signal and saw the light. Captain Sadler, of the tug Norfolk, in response to questions from counsel and the Court, stated that what brought the barge to his attention was the light on it and that he did not hear any bell, and that in his maneuvers to avoid a collision with the barge he did not miss it over 50 to 100 feet. The tug Norfolk was proceeding at a moderate rate of speed immediately before it saw the light. C. B. Sadler, also of the tug Norfolk, testified as follows: 'Q. How did you pick up this barge? Did you hear a bell or see a light? A. It was a light. Q. Did you hear a bell? A. Yes, sir.'

"Again, it is difficult to understand, if a bell on the barge was being regularly rung as required by the rules, why the crew of the tug Norfolk did not hear it a number of times before the tug was almost in collision with the barge. Lookout Lewis, who was stationed at the stem of the Del-Mar-Va and in a very

ance with his memorandum. On the 16th day of September, 1943, Mr. Vandeventer filed with Judge Way proposed findings of fact and conclusions of law, and a proposed

favorable position to hear bells, was positive in his testimony that none was rung. The three members of the crew stationed in the pilot house were equally positive that none was rung. While this testimony* is negative in form, the Court has reached the conclusion that it is entitled to weight, particularly that of Lewis, the lookout, whose testimony was distinctly unfavorable to his vessel on the question of the speed of the Del-Mar-Va.

"The contention of able counsel for the L.S.T. 389 that a bell which the crew of the Del-Mar-Va heard twice was on the L.S.T. 389 can not be sustained. That bell was first heard off the starboard quarter of the Del-Mar-Va and the second time was practically abeam of the Del-Mar-Va on her starboard side and some distance away. The barge L.S.T. 393 was moored some distance to the westward of the L.S.T. 389, and was giving signals from time to time. Those signals undoubtedly came from the L.S.T. 393 and not from the L.S.T. 389.

"The first indication to the crew of the Del-Mar-Va of the location of the L.S.T. 389, was when the barge's lights suddenly appeared in the fog almost dead ahead, an experience which was almost identical with that of the tugs Norfolk and Parksley. The tugs are smaller vessels and were proceeding at more moderate speeds, which accounts for their ability to avoid a collision.

"(4) No necessity is disclosed or suggested for mooring the L.S.T. 389 in the channel. The mooring there was apparently done through mistake and not intentionally, due, the Court concludes, to the fact that all of the members of her crew, except Lts. Carpenter and Murphy, were inexperienced and none of the crew was familiar with the waters in which they were mooring the L.S.T. 389. This is a very busy channel. It is in constant use by the tugs and barges of the Pennsylvania Railroad, the boats of the Ferry Company, and by Coast Guard and other vessels of the United States Navy.

"The decision of our Circuit Court of Appeals in The City of Norfolk [4 Cir.] 266 F. 641, seems to the Court to be directly in point. The Court said at page 644 [of 266 F.]: 'The general practical application of the statute is thus stated in The Margaret J. Sanford [4 Cir.], 213 F. 975, 130 C.C.A. 381: "If a vessel anchors at a point in the channel where, notwithstanding such anchorage, other vessels navigated with the care the situation requires can safely pass, then she has neither violated the statute nor rendered herself liable under the general rules applicable to navigation, even though she has to a certain extent obstructed the channel." The Job H. Jackson, D.C., 144 F. 896; Ann. J. Trainer [4 Cir.], 152 F. 1021, 82 C.C.A. 332; The Caldy [4 Cir.], 153 F. 837, 83 C.C.A. 19; The City of Birmingham [2 Cir.], 138 F. 555, 71 C.C.A. 115; The Europe [9 Cir.], 190 F. 475, 111 C.C.A. 307; The John G. McCullough, D.C., 232 F. 637; The W. H. Gilbert [6 Cir.], 232 F. 547, 146 C.C.A. 505. This only means that almost every anchorage in a channel is in a sense an obstruction of a part of the channel, in that it excludes other vessels from that part; yet many channels are so wide that an anchored vessel in the daytime, or even at night with nothing to obstruct the view, is no true obstruction, because it does not really interfere with the navigation of other vessels. But the statute was intended as an explicit legislative statement that the dominant use of channels is for passage, and not anchorage, and it does not permit a vessel to anchor voluntarily in a channel, when her presence there imperils other vessels, or requires more than ordinary skill or care in their navigation. Obviously masters of vessels are charged with knowledge that the coming of fogs or storms may make an anchored vessel an obstruction, when it would not be in fair weather.'

"In the instant case the Barge 389 voluntarily (though through mistake) anchored in a much used channel. During the dense fog that prevailed at and prior to the time of the collision (about 7:18 or 7:20 A.M.E.W.T., one hour earlier E.S.T., on December 10th) her presence there undoubtedly imperiled other vessels using the channel. All witnesses agree that it was still dark and the fog very dense when the collision occurred. It follows that each vessel should bear one-half of the total damages sustained as a result of the collision.

"Counsel for the parties will prepare and submit more comprehensive findings of fact, as heretofore suggested to them by the Court, and appropriate conclusions of law in accordance herewith.

"Norfolk, Virginia

/s/ Luther B. Way

"September 14, 1943

United States District Judge."

decree, sending copies to government's counsel. No objection was made to the decree, but on September 20, 1943, proctors for the government objected to two of the twenty-five proposed findings, and at a later date filed proposed findings of fact and conclusions of law for the government. In the meantime, on the 18th day of September, 1943, or shortly thereafter, proctors for the government served notice of an application for a stay of further proceedings until certain witnesses could be available to testify, and for a re-argument of the issues. The argument on this application was set by Judge Way for the morning of September 29, 1943. Mr. Vandeventer died very suddenly on the early morning of September 28, 1943, and consequently no argument was heard on such application on the date set.

Some days after Mr. Vandeventer's death, Mr. Barron F. Black, a surviving partner, called Judge Way for an appointment to discuss with him a matter other than the Del-Mar-Va cases. When he arrived at Judge Way's office he found Mr. Bradford, one of government's counsel, there waiting for him. Whereupon Judge Way stated to them that he had decided to allow the taking of Lt. White's testimony, and directed Mr. Bradford to draw an order to so provide.

Mr. Black took no part in the trial of the Del-Mar-Va cases, and had no opportunity to argue the motion to stay the proceedings.

Judge Way was stricken on the afternoon of October 7, 1943, and died on the afternoon of October 23, 1943. On October 8, 1943, a day or two after his call on Judge Way, Mr. Black sent a memorandum opposing entry of the proposed order,[2] not then knowing the serious nature of Judge Way's illness. Judge Way never considered the authorities submitted by Mr. Black, and never signed the proposed order staying the proceedings.

Judge Sterling Hutcheson was appointed on the 9th day of March, 1944, to succeed Judge Way. At the time of the trial of these cases, Judge Hutcheson was United States District Attorney for the Eastern District of Virginia, and consequently was of counsel for the government. Judge Hutcheson, therefore, disqualified himself and it was agreed that I hear the present motions on July 17, 1944.

It was admitted during the argument before me that the witness Lt. White was available through February and March of 1943, for the taking of his deposition; that Mr. Knauth did not take charge of the cases until April 2, 1943, but that he knew from what the other witnesses had told him what Lt. White would testify, and that he knew this before the cases were set for trial. There is no testimony from either Mr. Bradford or Mr. Knauth's predecessor, who was Mr. Harold Finn, and who had charge of the cases from December 10, 1942, to April 1, 1943, as to why the depositions of the absent witnesses were not taken. There is no explanation offered by counsel as to why a continuance was not asked by the government when it became apparent that Lt. White and other absent witnesses could not attend the trial. It is not contended that the testimony of any of the absent witnesses is newly or after-discovered evidence.

The admiralty practice is governed by certain federal statutes, by the Supreme Court's General Admiralty Rules, by District Court Admiralty Rules and by case law. There is no specific statute or admiralty rule covering the situation caused by the death of Judge Way prior to his signing formal findings of fact, conclusions of law (provided by Admiralty Rule 46½,

---

[2] "Order

"The United States of America, by counsel, having heretofore made a motion for a stay of further proceedings herein until certain absent witnesses may be produced in court or their depositions taken and the Court having given due consideration to the said motion and being of the opinion that the same should be granted, in part, doth grant the same, in part, on the following conditions:

"That the respondent promptly proceed to take the testimony of Lieutenant White as soon as he arrives at Solomon Island allowing reasonable time for notice of the taking of the depositions. That a stipulation be promptly prepared as to what the absent witnesses would say, which said stipulation shall be an incorporation of what the said witnesses have said at any hearing conducted by the Navy Department and opposing counsel shall be afforded an opportunity to examine the said records as to the testimony given by the absent witnesses whose testimony is incorporated in the stipulation.

"Norfolk, Virginia
"October ——, 1943.        United States
                          District Judge."

748

28 U.S.C.A. following section 723) and a decree in accordance therewith. But it is my opinion, and counsel for the parties here agree, that I may perform any duties in this case that Judge Way would have been empowered to perform if he were living and sitting at the hearing of the present motions, and that I have full authority to determine the same.

Counsel for the government seek relief by their motions upon the following grounds: (1) Because the cases were pending on the calendar of this court undisposed of at the time of the death of Judge Way, for Judge Way had only filed an informal memorandum; (2) because Judge Way had not signed findings of fact and conclusions of law; (3) because counsel had not agreed to any findings or conclusions; (4) because counsel for the government had applied to the court for a stay until certain absent witnesses had been produced, and Judge Way had directed the preparation of an order to that end but the same was unsigned and undisposed of at the time of his death; (5) because no decree had been entered; and (6) because two intervening libels had subsequently been filed.

These cases were exhaustively tried before an able and experienced District Judge, for whom I had the greatest admiration, and in whose judgment I had the highest confidence. They were fully argued by able counsel, orally, as well as by forceful written briefs, after which Judge Way made his informal findings, which were duly signed and filed by him. The record contains a full stenographic report of all the testimony, rulings and proceedings at the trial before Judge Way, which I have read and duly considered. Judge Way's "informal memorandum" is clear, definite, coherent and self-sustaining, and I concur in it. There were only three material contested points in the cases, (1) whether or not the Del-Mar-Va was proceeding too fast in a fog; (2) whether or not the L.S.T. 389 was anchored in the channel, and (3) whether or not the L.S.T. 389 was properly ringing its fog bell. Each of these points was definitely and clearly decided in Judge Way's findings.

■■ It has been decided by the Circuit Court of Appeals for the Fourth Circuit that where the opinion of the lower court in a civil case is sufficiently full, there is no necessity for formal findings of fact and conclusions of law. Carter Coal Co. v. Litz, 4 Cir., 140 F.2d 934, 936. In that case it was said: "The District Court filed no separate, formal findings of fact and conclusions of law. See Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Yet, in its lengthy opinion, the District Court embodied specific findings on all the material facts in the case and set out adequate and extensive conclusions on all the important questions of law which were raised. Under these circumstances, particularly since we base our affirmance upon one clear finding on one fact (the knowledge by Carter of the Taylor claims to the entire tract), it would be, we think, a futile gesture for us to follow a suggestion in Carter's brief and remand the case to the District Court for formal findings of fact and conclusions of law." In the case of Commercial Molasses Corp. v. New York Tank B. Corp., 2 Cir., 114 F.2d 248, 250, it was held that; "Although Admiralty Rule 46½, 28 U.S. C.A. following section 723, does not lay down the measure of conclusiveness of findings in the admiralty, it prescribes *nothing different from* Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c."

■■ In my opinion, Judge Way's "informal memorandum" embodied specific findings on all the material facts in the cases, and set out adequate conclusions on all the important questions of law involved therein. It was a decision of all the issues involved in the cases. In effect, he found the "facts specially and stated his conclusions of law thereon" in substantial compliance with Admiralty Rule 46½, 28 U.S. C.A. following section 723. It is a simple matter to convert Judge Way's "informal" findings into "formal" findings and enter a decree accordingly. I can see no reason for granting a "re-trial de novo" upon any of the grounds stated in the motion.

■ The government supports its other motion mainly by the statement that the testimony of Lt. White was essential to its cases; that this witness at the time of the trial before Judge Way was abroad in the service of his country, and therefore not available to testify at the trial, and that now the cases should be re-opened and an opportunity afforded the government to present his testimony. Other than the statement of government proctors there is nothing in the record, in the form of affidavit or otherwise, to show what the testimony of this witness would be. These

proctors, however, state that this witness actually took the bearings when the L.S.T. 389 anchored off Little Creek, Virginia, and that he would testify as to these bearings, and from them, the location of the vessel. Since the question as to whether or not the L.S.T. 389 was anchored in a dense fog in the much traveled channel leading into Little Creek was an important point in the decision on the merits, these proctors argue that this testimony should now be taken. A careful examination of the record shows that the bearings were taken, but not by Lt. White alone, but also by Lts. Murphy and Carpenter, each one checking against the other. The testimony of Lts. Murphy and Carpenter appears in great detail in the record. In addition, the log of the L.S.T. 389 was introduced as an exhibit, and it showed the bearings in question. Judge Way's finding upon this point is as follows: "On the occasion in question, to-wit, December 10, 1942, the invasion barge L.S.T. 389 was moored in the westerly half, near the center, of the channel leading from the Thimble Shoals or Cape Henry Channel, to the Little Creek Terminals of the Pennsylvania Railroad and the Ferry slip. In addition to the positive testimony of numerous witnesses, some of whom appear to be disinterested, that the Barge 389 was moored in the channel, the circumstance disclosed by the evidence of both sides, that three vessels manned by competent crews, all of whom were thoroughly familiar with the channel and the waters in that vicinity, encountered the Barge 389 the same morning in the channel, is convincing as to where it was moored. The vessels referred to are the Del-Mar-Va, which collided with the Barge 389, and the tugs Norfolk and Parksley, each of which almost collided'with it. The members of these crews were positive in their testimony to the effect that the barge was in the channel. None of the three vessels was off the regular course which it travelled daily, most of the time several times a day. * * * No necessity is disclosed or suggested for mooring the L.S.T. 389 in the channel. The mooring there was apparently done through mistake and not intentionally, due, the Court concludes, to the fact that all of the members of her crew, except Lts. Carpenter and Murphy, were inexperienced and none of the crew was familiar with the waters in which they were mooring the L.S.T. 389. This is a very busy channel. It is in constant use by the tugs and barges of the Pennsylvania Railroad, the boats of the Ferry Company, and by Coast Guard and other vessels of the United States Navy." Consequently, it appears to me that the testimony of Lt. White would merely be cumulative evidence, and would not, in my opinion, change the result. The courts have held that such evidence should not be taken after a decision. The Suduffco, D.C., 33 F.2d 775.

The decision of Judge Way held both vessels liable for half damages, the Del-Mar-Va being held guilty of proceeding too fast in a fog, and the L.S.T. 389 of anchoring in a busy channel in a fog, and of not properly ringing its bell. If Lt. White's testimony were taken, it would relate only to the first charge against the L.S.T. 389. That vessel would still be liable under paragraph (3) of Judge Way's findings for half damages for failing to ring its fog bell.

But there are other reasons for denying the government's motion to take this testimony. The rule is well settled that even in the liberal practice existing in admiralty courts, cases will not be reopened after decision to allow a party to introduce evidence which was obtainable by that party, unless surprise or other good cause can be shown. In the case of The Persiana, D.C., 158 F. 912, the Court passing upon a similar question to the one here said: "Libelant's motion to reopen and introduce in evidence claimant's depositions must be denied. He could have offered these depositions as part of his own case, but did not choose to do so. He was not surprised, and will therefore not be permitted to support his case by evidence at hand when the cause opened, but only sought to be used after both sides rested and argument developed infirmity in his deliberately chosen position." In the case of Merchants' Banking Co. v. Cargo of the Afton, 2 Cir., 134 F. 727, 731, after describing certain evidence which proctors for the appellees had neglected to introduce, the Court said: "We cannot grant the rehearing under these circumstances without ignoring a rule of procedure which rests upon the most solid foundations of propriety and expediency. In the language of Mr. Justice Story in Baker v. Whiting, Fed.Cas. No. 786, 1 Story [218], 236: 'I apprehend that no court of equity has ever felt itself at liberty

to grant an application of this sort upon the suggestion of an error of judgment or a mistake of law by counsel as to the pertinency or force of evidence to be used in a cause.' The rule is inflexible that leave is never given to admit new evidence after a decree where the party might by due diligence have introduced it originally in the cause, or had full and ample means of knowledge of it within his reach. As is said in the opinion in Norris v. Le Neve, 3 Atk.Rep. 36, the rule is one 'which cannot be broken in upon without manifest danger to the interests of all the parties in controverted suits, and it certainly will not do to lay down a new rule for this cause only.' " In the case of The I. F. Chapman, 1 Cir., 241 F. 836, 839, it was said: "The claimant having had from June 25, 1914, until April 26, 1915, to prepare his evidence on the question of damages, and having closed his case May 25, 1915, *without requesting further time or further hearing,* could not be granted a reopening of the case for further evidence upon the grounds set forth in his motion of November 20, 1915, on the accompanying affidavits. These disclosed no excuse for the failure to make full investigation before trial, and set forth no additional evidence, except such as was merely cumulative, and not such in its nature as could substantially modify the assessment based upon the evidence heard." (Emphasis added.) Any other rule than the one set out in the foregoing authorities would seriously interrupt the orderly conduct of litigation. Cf. Hatch v. The Newport, C.C., 44 F. 300; The Teaser, D.C., 217 F. 920; Benedict on Admiralty, 6th Ed., Vol. 3, sections 404 and 409.

■ In these cases the government has failed to produce any evidence of surprise or of any good cause why the motion should be granted. Lt. White's testimony is in no sense newly discovered. The collision occurred on December 10, 1942. This witness was available for deposition through February and March, 1943, and counsel for the government were fully informed as to what he would testify. The record is silent as to why his testimony was not taken by deposition, or why a continuance was not asked on the ground of his absence, or why an admission of a statement of his testimony was not requested, or why a postponement was not requested at the conclusion of the testimony. The testimony of other witnesses

from the same crew was taken by deposition. The record shows that the government closed its case without reservation at the end of the testimony. The government has had its day in court. It has had a fair trial before an able and experienced Judge, and was represented by counsel of unusual ability, and extraordinary experience and learning in admiralty matters. When such counsel decided to go to trial in cases like these without moving for a continuance on the ground of the absence of Lt. White, knowing what his testimony would be, or without asking that a statement of his testimony be admitted at the trial, or without asking for an opportunity to take his deposition, I can only assume that counsel was at the time satisfied that such testimony was merely cumulative or that the government would prevail without it, and, therefore, concluded to proceed with the trial and rest the case without such testimony. If I were to grant a new trial or re-open the cases for the purpose of taking additional testimony under such circumstances, it is my opinion that such action would be an abuse of discretion. However, it is my opinion that such testimony is merely cumulative and I do not believe the result in these cases would have been different if Lt. White had testified at the trial.

■ But the government contends that Judge Way had before his death decided to allow the taking of Lt. White's testimony. It appears that the matter was taken up in an informal manner with Judge Way, and that he decided to enter an order allowing the government to take Lt. White's testimony. When Judge Way made this decision he did not have the benefit either of a full statement of the law or of the facts, or benefit of argument from counsel. Proctors for the Virginia Ferry Corporation had had no opportunity to present the authorities that have been presented to me. I am satisfied that if Judge Way had had an opportunity to read the authorities herein cited and the admissions herein stated, he would not have signed the proposed order.

■ Counsel for the government say, incidentally, that the trial was held in the absence of four other members of the crew of the L.S.T. 389 who are still overseas, and that a proper appeal record should include their testimony. However, no mention is made as to what their testimony would be, or why their depositions

were not taken, or why a postponement was not asked on the ground of their absence. Under such circumstances, I cannot grant the motions on this ground.

The government lastly contends that the filing of intervening subsequent petitions by parties claiming personal injury and property loss as a result of the collision, requires a re-trial of the cases. There is no merit in this contention. These parties came tardily into the cases after the decision on the merits, and they must now be governed by the status of the cases when their petitions were filed. Their proctors have stated in open court that they are quite willing to abide by Judge Way's decision.

Although it is my opinion that Judge Way's "informal memorandum" constitutes a substantial compliance with Admiralty Rule 46½, I make the same findings and conclusions, and designate them as formal findings of fact and conclusions of law, as provided by Admiralty Rule 46½, and counsel may, therefore, submit findings of fact and conclusions of law in accordance with Judge Way's findings and the admitted facts, decree accordingly, together with order denying both motions.