## THE CITY OF NORFOLK.*

### THE HAWKHEAD.

(Circuit Court of Appeals, Fourth Circuit.   April 6, 1920.)

No. 1763.

1. **Collision ⚖=8—Local rule as to anchorage in channels supplanted by federal statute.**

    A Norfolk harbor rule, providing that "vessels * * * are forbidden to anchor in the channel," *held* supplanted by the federal statute (Act March 3, 1899, § 15 [Comp. St. § 9920]) providing that "it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft."

2. **Collision ⚖=69—When anchorage in channel is unlawful.**

    Act March 3, 1899, § 15 (Comp. St. § 9920), making it unlawful for vessels to anchor in channels in such manner as to prevent or obstruct the passage of other vessels, does not permit a vessel to anchor voluntarily in a channel when, although there is sufficient room for other vessels to pass, her presence there imperils them or requires more than ordinary skill or care in their navigation, and masters are charged with knowledge that the coming of fogs or storms may make an anchored vessel an obstruction, where it would not be in fair weather.

3. **Collision ⚖=69—Vessel caught in fog may be justified in anchoring in channel.**

    A vessel caught in a dense fog while moving in a channel is justified in anchoring in the channel, giving the statutory signals, where that appears less dangerous under the circumstances and conditions than proceeding to the open sea or established anchorage grounds, and in case of collision while so anchored is entitled to the presumption in favor of a vessel at rest against a moving vessel.

⚖=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
266 F.—41    *Certiorari denied 253 U. S. —, 40 Sup. Ct. 584, 64 L. Ed.   —.

**4. Collision ☞82 (1)—Duty of vessel to proceed at "moderate speed" to anchorage or open sea.**

"Moderate speed," with reference to the duty of a master and pilot of a vessel caught by a dense fog in a channel, in which the vessel at anchor would be an obstruction to another vessel navigated with due care, to get out of the way of other vessels by moving on with moderate speed to the nearest anchorage grounds or the open sea, means speed so slow that the vessel can be stopped within the distance at which another vessel can be seen.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Moderate Speed.]

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty for collision by Frank Hand, master of the British Steamship Hawkhead, against the Chesapeake Steamship Company of Baltimore City, owner, and John Thomas, master, of the steamer City of Norfolk. Decree against the City of Norfolk, and her claimants appeal. Affirmed.

For opinion below, see 248 Fed. 780.

Floyd Hughes, of Norfolk, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellants.

Robert M. Hughes, Jr., of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

WOODS, Circuit Judge. This appeal brings under review the decree of the District Court holding the Chesapeake Line freight steamer, City of Norfolk, solely at fault for collision with the British tramp steamer Hawkhead, at anchor in the channel of Elizabeth river about 7 o'clock in the evening of October 6, 1916.

The Hawkhead is 385 feet long, 56 feet 6 inches beam, 26 feet 5 inches deep. She left Lamberts Point pier, going to sea, about 5:30 in the afternoon, in charge of a Virginia pilot. Seeing a dense fog approaching, the pilot first attempted to turn the vessel, with the intention of going back to her pier; but before the turn could be made the fog became so dense and imminent that the effort to turn was abandoned. After consultation the master and pilot decided it would be safer to anchor than to return to Lamberts Point or to proceed to the anchorage ground in Hampton Roads, a mile to 2 miles distant. Accordingly the vessel was anchored near gas buoy 12, so that she was lying partly within and partly without the channel. This was at a time when the pilot knew the outgoing steamers were shortly to be expected. At the place of anchorage the channel for a width of 400 feet was 35 feet deep, and for 200 feet more 30 feet deep. At anchor the Hawkhead so extended into the channel as to leave fairway in the 35-foot channel not less than 75 feet wide, and in the 30-foot channel from 200 to 250 feet wide.

The City of Norfolk, a vessel 297½ feet long, 46 feet beam, 16 feet 2 inches deep, left Norfolk at 6:30. Proceeding in the fog, her offi-

cers and watch did not observe the Hawkhead in time to stop and avoid collision. Each vessel was in charge of an experienced master and pilot.

The District Court found:

"That the lookout on the City of Norfolk was grossly negligent in not hearing and reporting the fog bell sounded from the Hawkhead earlier than he did, and that the City of Norfolk was proceeding at undue speed, in utter disregard of the law and regulations prescribed for the control of her movements in fog."

Since this conclusion has abundant support in the testimony of witnesses who were before the court, it is not subject to review.

[1] Was the Hawkhead also at fault in anchoring in the channel and not proceeding to the usual anchorage grounds in Hampton Roads? The Norfolk harbor rule forbids anchoring in a channel in this language:

"Vessels entering the harbor and intending to come to anchor or dropping out from wharves or docks preparatory to departure, must anchor under direction of a harbor master, *and are forbidden to anchor in the channel.*"

The federal statute provides:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels, *in such a manner as to prevent or obstruct the passage of other vessels or craft.*" Act March 3, 1899, c. 425, § 15 (Comp. St. § 9920).

Indisputably the absolute prohibition of the local rule would have been valid before the Congress had acted on the subject. On that subject the Supreme Court has said:

"The power of the city authorities to pass and enforce these two ordinances is disputed by the libelants. But regulations of this kind are necessary and indispensable in every commercial port, for the convenience and safety of commerce; and the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time, and what description of light she shall display at night to warn the passing vessels of her position and that she is at anchor and not under sail. They are like to the local usages of navigation in different ports, and every vessel, from whatever part of the world she may come, is bound to take notice of them and conform to them. And there is nothing in the regulations referred to in the port of Charleston which is in conflict with any law of Congress regulating commerce, or with the general admiralty jurisdiction conferred on the courts of the United States." Owners of the Brig James Gray v. Owners of the Ship John Fraser, et al., 62 U. S. 184, 187.

The Congress had not legislated on matters regulated by the Charleston harbor rules, and they were therefore held valid. So, also, in Steamship Company v. Joliffe, 2 Wall. 450, it was held that the local rules regulating pilotage in San Francisco harbor were valid, because the act of Congress of 1852 did not cover the same subject, but related exclusively to ocean pilotage. The rule as to state statutes or regulations alleged to be inconsistent with federal legislation is thus stated in Gulf, Colorado, etc., Railway v. Hefley, 158 U. S. 98, 103:

"The question is not whether, in any particular case, operation may be given to both statutes, but whether their enforcement may expose a party to a conflict of duties. It is enough that the two statutes operating upon the

same subject-matter prescribe different rules. In such case one must yield, and that one is the state law."

"It may be conceded that, were there no congressional legislation in respect to the matter, the state act could be held applicable to interstate shipments as a police regulation. Railroad Company v. Fuller, 17 Wall. 560." Gibbons v. Ogden, 9 Wheat, 200, 6 L. Ed. 23; Gilman v. Philadelphia, 3. Wall. 713, 18 L. Ed. 96; Escanaba Co. v. Chicago, 107 U. S. 678, 683, 2 Sup. Ct. 185, 27 L. Ed. 442; The Hamilton, 207 U. S. 398, 28 Sup. Ct. 133, 52 L. Ed. 264; Minnesota Rate Cases, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 154, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18.

It was intimated in The Margaret J. Sanford, 213 Fed. 975, 130 C. C. A. 381, though the point was not necessarily involved in the decision, that the local harbor rule is not an absolute prohibition to anchor in the channel, but "impliedly extends to anchoring so as to obstruct the channel." Such a modifying implication to express language could only be based on the ground that it was required by the dominant federal statute.

In the case before us the local regulation covers the subject and makes an absolute prohibition against anchoring in a channel: the federal statute covers the same subject, and prohibits anchoring in a channel only when it will prevent or obstruct navigation. Stated conversely, the federal statute allows anchoring in a channel when it does not prevent or obstruct navigation, while the local regulation forbids it. If, while the local rule above quoted was in force, the board of harbor commissioners had made another rule in the terms of the federal statute, obviously the old rule containing the absolute prohibition would have been completely abrogated. Surely the act of Congress on the subject must have the same effect. We hold, therefore, that the local rule is supplanted by the federal statute of 1899.

[2] The general practical application of the statute is thus stated in The Margaret J. Sanford, 213 Fed. 975, 130 C. C. A. 381:

"If a vessel anchors at a point in the channel where, notwithstanding such anchorage, other vessels navigated with the care the situation requires can safely pass, then she has neither violated the statute nor rendered herself liable under the general rules applicable to navigation, even though she has to a certain extent obstructed the channel." The Job H. Jackson (D. C.) 144 Fed. 896; Ann. J. Trainer, 152 Fed. 1021, 82 C. C. A. 332; The Caldy, 153 Fed. 837, 83 C. C. A. 19; The City of Birmingham, 138 Fed. 555, 559, 71 C. C. A. 115; The Europe, 190 Fed. 475, 111 C. C. A. 307; The John G. McCullough (D. C.) 232 Fed. 637; The W. H. Gilbert, 232 Fed. 547, 146 C. C. A. 505.

This only means that almost every anchorage in a channel is in a sense an obstruction of a part of the channel, in that it excludes other vessels from that part; yet many channels are so wide that an anchored vessel in the daytime, or even at night with nothing to obstruct the view, is no true obstruction, because it does not really interfere with the navigation of other vessels. But the statute was intended as an explicit legislative statement that the dominant use of channels is for passage, and not anchorage, and it does not permit a vessel to anchor voluntarily in a channel, when her presence there imperils other vessels, or requires more than ordinary skill or care in their navigation. Obviously masters of vessels are charged with knowledge that the

coming of fogs or storms may make an anchored vessel an obstruction, when it would not be in fair weather.

[3, 4] The difficulty presented here is to define the duty of a vessel caught in a fog while moving in a channel. Should she go on until she reaches open water or safe anchorage ground, using the precautions required by subdivision (a) of article 15 and article 16 (Comp. St. §§ 7888, 7889), or anchor in the channel, ringing her warning bell, as required by subdivision (d) of article 15? Since a vessel anchored in a channel and not visible because of a fog is usually a dangerous obstruction to navigation, does the act of 1899 forbid anchoring in a channel in a fog? The authorities are hardly reconcilable. Having in view, however, the statutes, the current of judicial thought,[1] and the rule of reason, we think the matter may be thus stated: The first thought and object of the master and pilot of a vessel caught by a dense fog in a channel in which the vessel at anchor would be an obstruction to another vessel navigated with due care should be to get out of the way of other vessels by moving on with "moderate speed" to the nearest anchorage grounds or the open sea. In such navigation "moderate speed" means speed so slow that the vessel can be stopped within the distance at which another vessel can be seen. If the fog is so dense as to justify the master in believing that another vessel going at a moderate speed could not be seen at the distance in which he could stop his vessel, and that the two vessels would be in danger of collision, then the master should anchor and give the statutory signals. Even if he thus obstructs the channel, he is not responsible, because it is done under necessity. Doubt as to this necessity should be solved by weighing all the circumstances and conditions, such as the width of the channel, the flow of the tide, the force of the wind, the probability of meeting other vessels, the size of the ship, and distance and course to the nearest anchorage. If the navigator of the vessel, upon careful consideration of all the circumstances, reasonably concludes that necessity requires anchorage he should not be held in fault, and in case of collision should be held entitled to the presumption in favor of a vessel at rest against a moving vessel. The duty of the master of the approaching vessel is to stop as soon as he hears the fog signal.

The District Court in effect applied this test of necessity, and found as a conclusion of fact, on a conflict of evidence, that under the circumstances, the master and pilot of the Hawkhead exercised a wise

[1] The Pennsylvania, 86 U. S. (19 Wall.) 125, 22 L. Ed. 148; The Clarita, 23 Wall. 1, 23 L. Ed. 146; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; The Martello, 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Chattahoochee, 173 U. S. 540, 548, 19 Sup. Ct. 491, 43 L. Ed. 801; United States v. St. Louis, etc., Trans. Co., 184 U. S. 247, 22 Sup. Ct. 350, 46 L. Ed. 520; Lie v. San Francisco & Portland S. S. Co., 243 U. S. 291, 37 Sup. Ct. 270, 61 L. Ed. 726; The Express (D. C.) 48 Fed. 323; Id., 61 Fed. 513, 9 C. C. A. 598; The H. F. Dimock, 77 Fed. 226, 23 C. C. A. 123; La Bourgogne, 86 Fed. 475, 30 C. C. A. 203; The Benjamin A. Van Brunt, 98 Fed. 131, 38 C. C. A. 668; The City of Lowell, 152 Fed. 593, 81 C. C. A. 583; The Annasona (D. C.) 166 Fed. 801; The Persian, 131 Fed. 439, 104 C. C. A. 187; The Georgia (D. C.) 208 Fed. 635; The Pocohuntas (D. C.) 217 Fed. 135; The Belfast (D. C.) 226 Fed. 362.

discretion in coming to anchor; that she put out lights and sounded her bell in accordance with the regulations; that the City of Norfolk would have passed in safety if she had been navigated with due care. The law having been properly applied, this court is bound by these findings of fact.

Affirmed.