### THE CITY OF RICHMOND.
### THE TEXAN.

(District Court, D. Maryland. June 11, 1920.)

1. **Collision** ⊚═82 (2)—**Moving vessel in fault for collision with anchored vessel in fog.**
   Under the rule that a steam vessel in fog must limit herself to a speed so slow that she can be stopped within the distance at which another vessel can be seen, a steamer which navigated Chesapeake Bay in a dense fog at a speed of 3 or 4 miles an hour *held* in fault for collision with a steamship anchored on the anchorage grounds in Baltimore harbor, although extending somewhat into the channel, where her fog signal was being sounded and was heard by the approaching vessel and several hundred feet in width of the channel was unobstructed.

2. **Collision** ⊚═69—**Steamship not in fault for place and manner of anchorage.**
   A large steamship *held* not in fault for a collision, while she was anchored on the anchorage grounds in Baltimore harbor, because of her place and manner of anchorage, where on loading and moving into the channel on the afternoon before it was not safe to proceed, because of fog and floating ice, and she was taken to the anchorage ground by her pilot, nor because on a change of wind during the night she did not move, nor put out both bow and stern anchors, which was not customary for such vessels.

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for collision by Walker D. Hines, Director General of Railroads, Howard E. Willing, master of the steamer City of Richmond, and the Chesapeake Steamship Company, former owner of said steamer, against the Steamship Texan, with cross-libel. Decree for cross-libelant.

George Weems Williams and L. Vernon Miller, both of Baltimore, Md., for libelants.

Janney, Stuart & Oher and Milton Roberts, all of Baltimore, Md., for respondent.

ROSE, District Judge. In a dense fog on the morning of January 9, the bay steamboat City of Richmond ran into the ocean going steamship Texan, while the latter was riding at her anchor dropped upon the anchorage grounds in Baltimore harbor. Each was damaged, and each says the other was solely to blame.

[1] The City of Richmond was inbound. Her master thinks she was near the center of the channel, but he admits she may have been in its starboard half. She did not see the Texan until the latter's stern loomed up out of the fog on her starboard bow only 100 feet away. She at once put her engines at full speed astern. It was too late. She scraped along the port side of the Texan, doing some damage to the latter, and suffering more herself.

There is no question that the Texan's fog bell was being duly sounded, as required by law. The master of the City of Richmond heard bells, but he did not know from what vessel they came. At the point of collision, the channel is 600 feet wide, and several hundred feet of it were unquestionably clear of any obstruction.

The City of Richmond says that at the time she first saw the Texan she was not going more than a knot an hour, and she points in corroboration to the fact that after the collision she came almost immediately to a full stop; but her so doing may have been due to the resistance offered by the comparatively immense weight of the Texan. It is certain that during most of the night, in which other bay craft came to anchor, she, with a stop of but an hour, had come from West Point and her other York river landings to the entrance of the Baltimore harbor, in thick weather, through floating ice, at a speed almost equal to the best she is accustomed to make under midsummer conditions. According to her log, she passed the Lazaretto Light at 8:52 a. m. and Henderson's Wharf 23 minutes later. As the distance between these points is close to a mile and a half, her average speed during the whole time could not have been less than 3 to 4 miles an hour, allowing nothing for the stoppage caused by the collision, and not taking into account the possibility that she moved faster before she met with misfortune than she did afterwards. On the whole, it is difficult to avoid the conclusion that she was going very much faster than she now admits.

The Circuit Court of Appeals of this circuit has recently said in The City of Norfolk, 266 Fed. 641, that the moderate speed to which a vessel under such conditions as those which confronted the City of Richmond must limit herself means "a speed so slow that the vessel can

be stopped within the distance at which another vessel can be seen. If the fog is so dense as to justify the master in believing that another vessel going at a moderate speed could not be seen at the distance in which he could stop his vessel, and that the two vessels would be in danger of collision, then the master should anchor and give the statutory signals." The City of Richmond was going at such a speed in the direction from which fog bells were sounded that, after she had seen the motionless Texan, she could not stop in time to avoid a crash. Her fault is clear.

[2] Was the Texan also to blame? She was an oil burner, and on the preceding day, having completed the loading of her cargo, she had been towed to the Standard Oil pier to take on her supply of fuel oil. Her master had gone up to the custom house to clear her, leaving instructions for her to pull out into the stream, and he would board her there. As the result of her touching bottom, the ship was delayed in getting away, and her master and pilot joined her as she was being pulled out of the dock by an attending tug. When she was headed and steadied down stream, the tug cast off. She was a quarter of a mile or more from the pier. It was a little short of 2 o'clock in the afternoon of a short winter day. There was a good deal of fog about the inner harbor where she was, and it appeared to be thicker farther out. There was much floating ice and many of the buoys were out of place. The night promised to be one in which lights would not be visible. The captain of the tugboat was still on the bridge of the ship. He, the pilot, and the ship's master agreed that it would be unwise to go out that afternoon. The master decided to anchor, and the pilot and the tugboat captain showed him where the anchorage grounds were. The ship was under its own steam, being pushed by the tug when such assistance was useful. She was brought to what was thought to be the best place for anchorage. Her port bow anchor was there let go, and 30 fathoms of chain paid out. She backed until it was taut or nearly so. The wind was from the west or northwest, and her stern came within 150 to 200 feet of the pier head line, which in that vicinity, runs almost north and south. She could not safely have taken a more easterly anchorage, for, if she had, the farther paying out of chain which a freshening of the westerly wind might have required, would have cast her upon the piers.

She was a large and heavy ship, drawing 31 feet 6 inches of water and having a length of 487 feet. In this harbor the anchorage grounds are restricted in area. Anchored where the Texan was, if the wind changed to the east or northeast, as during the night it did, the ship would swing around, so that from 100 to 200 feet of her after part would be in the channel, and yet, if she was to anchor in this publicly provided anchorage ground at all, the place at which she dropped her anchor was well chosen. It has been suggested that she should have gone on some distance further to other anchorages. All of them were themselves narrow, and were quite close to the main ship channels. Their advantages, if any, were too small to impose upon her any duty of traveling to them in the thickening fog and ice.

It is contended that, if what has thus far been said is true, she

should not have left the Standard Oil pier, but should have returned to it when she made up her mind not to go to sea that day. The wharf in question is private property. Ships are invited to come to it for oil, and they are expected to leave it when their tanks are filled. The master of the Texan would not have been justified in remaining in it, unless the circumstances were such that to leave it would obviously expose his ship or others to serious danger. In the slip it seemed to him that he might be able to start on his voyage at once. He may not be held blameworthy for going out into the harbor, in the hope that further progress might be safely made. In the stream he had a somewhat better and wider view. What he there saw convinced him, the licensed pilot, and the tugboat captain that it would not be prudent to proceed. The two men with whom he consulted were exceptionally qualified to advise him on such a question. When he made up his mind to stop, what was he to do? The fact that he had an hour before bought oil from the Standard Oil Company gave him no more right to occupy, uninvited, its pier than he would have had to put his ship alongside any other wharf in the neighborhood. It did not belong to his owners, and neither he nor they had any rights in it.

It has been suggested that, if he let go his anchor where he did, he should, when the wind shifted, have weighed anchor and cast it again in a place further to the eastward, so that his ship could not get into the channel. In such weather it was not expedient to have as bulky a ship as the Texan groping around in such limited anchorage grounds, to say nothing of the danger of anchoring in a position in which a sudden change of wind would have thrown her aground on the north or against the piers on the east.

The contention most earnestly stressed by the advocates for the City of Richmond is that the Texan, knowing how narrow the anchorage was, should have put out a stern anchor also, and so moored herself as to make swinging impossible. It is not customary for merchant ships to do anything of the kind. Witnesses of many years' experience in the Baltimore harbor, men whose duties require them to be observant of such matters, unite in saying that the only occasion on which it was, to their knowledge, ever done, was that of a battleship on a very recent visit to the inner harbor of this city.

Courts have occasionally suggested that under certain circumstances it may be the duty of a ship to hold herself steady by the use of both bow and stern anchors. Such observations have usually been made when the ship was so anchored that its swinging would nearly or altogether close a channel. The Texan argues that it is so rare for merchant vessels to make themselves fast in the manner suggested that an unexpected resort to it in thick weather would increase rather than diminish danger to other craft. When a ship's lights are made out, the natural presumption, in view of the almost universal practice, is that the ship is heading to wind and tide. If, in a particular instance, this assumption turns out to be wrong, a collision may well result.

It is unnecessary to pass upon this contention, for, if the Texan be held blameworthy for not mooring, she will be held to a standard of

care exceeding that habitually exercised by prudent mariners, and be punished for not doing what no merchant ship appears ever to have done in the Baltimore harbor. That would seem to be a severe measure, when the direct and proximate cause of the collision was the clear breach of duty on the part of the City of Richmond.

The Texan, under the fifty-ninth rule (29 Sup. Ct. xlvi), brought in the Curtis Bay Towing Company upon the theory that, if she was to be held for anchoring in a wrong place, the employer of the tugboat captain, who selected the anchorage, was liable for it. As the City of Richmond must be held solely to blame, it is unnecessary to inquire whether the tug or its owner would have been in any event chargeable.

It follows that the petition against the Curtis Bay Towing Company must be dismissed. The City of Richmond will be held solely in fault, and the usual decree may be presented.