**VICTORIAS MILLING CO., Inc.,**
**Libellant,**

v.

**THE S.S. GULFPORT, her engines, boilers, etc., and Gulf Oil Corporation, Claimant-Respondent and Cross-Libellant.**

United States District Court
S. D. New York.
March 31, 1958.

Hanrahan & Costello, New York City, Michael E. Hanrahan, New York City, of counsel, proctors for libellant.

Burlingham, Hupper & Kennedy, New York City, Robert F. Lynch, New York City, of counsel, proctors for claimant-respondent and cross libellant.

BICKS, District Judge.

On the night of April 23, 1955 the freighter M/V Nonsuco collided with the tanker S.S. Gulfport in Ambrose Channel.

Victorias Milling Co., Inc., as owner of the M/V Nonsuco instituted this suit in admiralty against the S.S. Gulfport in rem, and against her owner Gulf Oil Corporation, for the recovery of $30,000 damages allegedly sustained as a result of said collision. A cross-libel was filed by Gulf Oil Corporation, claiming damages in the sum of $10,000.

As in so many other instances of maritime collision claim is made on behalf of each vessel that the other was solely at fault. All of the witnesses at trial were interested and all but two testified by deposition.

The S.S. Gulfport, a tanker of 8,081 gross tons, 463 feet length over all with a beam of 64 feet, left Bridgeport, Connecticut, on the evening of April 22 bound for Port Arthur, Texas. She came down Long Island Sound, through the East River and New York Harbor to Stapleton, Staten Island, where her pilot disembarked, and proceeded seaward. Immediately after passing buoy 19–A, commonly known as Craven Shoal, the vessel encountered dense fog and anchored to the left of the channel, off Norton's Point. This was at 2:05 a. m. on April 23rd. At 7:05 p. m. with a flooding tide and a visibility of two to three miles, the Gulfport weighed anchor and moved into a line of vessels outbound through two thousand foot wide Ambrose Channel, to the sea. She was light in water ballast with a draft of ten feet forward and 19.6 feet aft. Her course kept her starboard side 50 to 100 feet from the odd numbered black buoys with flashing lights, that mark the channel's westerly edge.

When the Gulfport reached buoy 15 a "wispy" fog began to set in, but buoy-to-buoy visibility continued until buoy 11. At this point, visibility was zero. Those on the bridge could not see beyond the Gulfport's bow, 195 feet away, but could hear the bells and whistles of several

ships moving and anchored nearby. Since it would have taken 500 feet to stop the Gulfport when moving at 1½ knots and since a 2 to 3 knot speed was needed to maintain steerageway her captain gave orders to anchor at 8:20 p. m. To starboard was Romer Shoal with a maximum depth of 20 to 22 feet; to port across the channel was another shoal, East Bank, and a gully too small for the Gulfport's then draft. In neither direction outside the channel could the Gulfport have had the safe 3 to 4 foot cushion needed to protect her from the hard bottom during a swell, or at the time of getting under way.

The chief mate let go the port anchor with 45 fathoms of chain on the windlass, anchoring the Gulfport between buoys 9 and 11 near the westerly edge of the channel. The Gulfport's anchor lights and cluster lights were switched on. The anchor bell in the forecastle and the gong in the stern were continually sounded in accordance with regulations and the engine was placed on "stand by". On watch were the third mate, quartermaster, an able bodied seaman, an ordinary seaman and the captain. Drift lead showed the anchor was not dragging but the change of tide from flood to ebb reversed the Gulfport's heading towards Staten Island, the gyro-compass reading 320 degrees at the time of collision.

The M/V Nonsuco, a dry cargo freighter, 439 feet long over all and 56 feet 11 inches wide, left Brooklyn Pier 8 at 9:32 p. m., April 23rd, bound for Baltimore, Maryland, with a draft of 8 feet forward and 16 feet 5 inches aft. The weather was cloudy but visibility good. At 10:18 while passing St. George, Staten Island, fog began to set in and the chief mate was sent to the bow. As the Nonsuco moved further down the harbor, past the Narrows and into Ambrose Channel, the fog thickened—a patchy fog, sometimes concealing the ship's bow from those on her bridge, and other times permitting a view of 300 feet. She passed buoys 17, 15 and 13 about 200 feet from her starboard, hearing all the while fog whistles and anchor bells from several directions. Since the vessel was not equipped with a gyro-compass the quartermaster was ordered to steer by a course. Certain fog precautions were taken: regulation signals were given every minute; speed alternated slow ahead and stop; the captain and an experienced Sandy Hook pilot were constantly on the bridge, along with the third mate, lookout and helmsman; the quartermaster was on the wing bridge; the chief mate and a sailor were on the bow. When the Nonsuco was in the vicinity of buoy 13 the pilot began looking for a safe place to anchor outside the channel to the west. As each of the so-called anchorages was approached anchor bells were heard. At this time too a vessel was following about three lengths astern on the port quarter.

Soon after passing buoy 11 the Nonsuco encountered a ship anchored at the western edge of the channel. She moved out toward the center of the channel and passed it starboard to starboard. After proceeding a bit further the chief mate phoned the bridge from the bow reporting a ship's whistle ahead. He phoned a second time when her anchor lights and silhouette appeared about three lengths away and almost dead ahead; and a third time when the Nonsuco was getting "too close".

With the first call to the bridge the engines were stopped and the pilot put the helm right. After the "too close" report, the pilot ordered full astern on the starboard engine. The captain, not satisfied with the pilot's one bell astern rang full astern starboard engine twice. When the Gulfport was clearly seen from the bridge and it appeared that her bow was not going to be cleared, the captain rang both engines full speed astern.

The fog signal and white masthead and range lights of the Nonsuco were observed by the master and watch officer on the Gulfport's starboard. The white range lights opened suddenly and her red side light showed. This, the master of the Gulfport testified, indicated to him that the Nonsuco was making a swing to her right, toward the westward, directly

across the bow of his ship. Recognizing the danger of collision the danger signal of five or six short blasts on the whistle was sounded. The watch officer was dispatched to the bow to slack the anchor chain, a general alarm was rung and the engines were put on slow astern.

These efforts proved abortive. Within about one minute after the white range lights were first observed by the captain of the Gulfport, the collision occurred. The portside of the Nonsuco bulkhead and forecastlehead struck the Gulfport stem in a "pretty hard", "violent" blow causing a dent of three feet radius on the wide plating of the stem slightly to the portside.

Factual dispute seems to revolve about three issues: (1) Were proper fog-safety measures in the matter of lookouts, lights, and signals employed; (2) where was the Gulfport anchored at the time of the collision; (3) was the Nonsuco proceeding at a reasonable rate of speed through the fog?

Witnesses on neither ship saw lookouts on the other as they collided, though all witnesses agreed that their own ship had numerous men on bridge and bow once the fog set in. Those on the Nonsuco, except for Pilot Florimont heard no bell from the Gulfport until just prior to the collision. Able Seaman Gooden attached to the Gulfport saw no lights at all on the Nonsuco. I find that both vessels were taking those measures with regard to lookouts, lights, and signals which the law requires under the circumstances. Article 2, 30 Stat. 96 (1897), 33 U.S.C.A. § 172; Article 15, 30 Stat. 99 (1897), 33 U.S.C.A. § 191(a) (d) (1957).

The dispute as to the Gulfport's location at anchor is less easy to resolve. Between the time of the collision and the following morning, she had not heaved anchor or shifted her position. On that morning the chief mate noticed her position relative to buoys 9 and 11. She was headed east in the channel with the buoys just a bit "abaft the beam" (11 to port; 9 to starboard).

The pilot aboard the Nonsuco testified that the Gulfport was somewhere near the center of the channel. He recalls that some distance beyond buoy 11 the Nonsuco had pulled toward the center of the channel to pass another vessel anchored near to the westerly edge. Before the Nonsuco was able to return to its original course, along the channel side, he testified she encountered the Gulfport, well toward the center where he had never before seen a ship anchored.

I find the Gulfport at the time of the collision to have been anchored somewhere between buoys 9 and 11, at, or very near to, the westerly edge of the channel.

 30 Stat. 1152 (1899), 33 U.S. C.A. § 409 (1957) makes it unlawful "to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft." But, it is well established that this prohibition is not absolute. Atlantic Refining Co. v. Moller, 1943, 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168; The City of Norfolk, 4 Cir., 266 F. 641, certiorari denied 1920, 253 U.S. 491, 40 S.Ct. 584, 64 L.Ed. 1028. Exceptions are allowed "where literal compliance with its terms would create a danger to navigation which could be avoided or reduced by violation of its terms." Atlantic Refining Co. v. Moller, supra, 320 U.S. at page 466, 64 S.Ct. at page 227. The Gulfport, anchored as it was at the edge of the channel permitted passage through the greater part. She presented no navigational danger to ships complying with fog regulations. The alternatives were to anchor as she did; to proceed ahead at a speed too slow for maintaining steerageway; to go faster in violation of Article 16 (see discussion below); or to attempt anchoring outside the channel in too shallow water. Any of the latter three courses would have been dangerous to the Gulfport and, in most cases, to other vessels as well.

Finally, there is disagreement as to the Nonsuco's speed prior to the collision. Her captain estimated it as sometimes 3 and sometimes 5 knots; her pilot at 2 knots; the captain of the Gulfport gave an estimate of 6–7 knots. I accept the estimates made by the captain of the Nonsuco. That speed was immoderate and in violation of Article 16, 30 Stat. 99 (1897), 33 U.S.C.A. § 192 (1957). It was too fast during a fog which permitted visibility only occasionally beyond the ship's own bow. See e. g., Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 2 Cir., 1955, 224 F.2d 86, 87. As Judge Learned Hand stated, "everybody knows, the courts have imposed a gloss upon [Article 16] that 'moderate speed is that at which, if the other vessel also does her duty, the vessel will be able to stop her way before they collide' ". Anglo-Saxon Petroleum Co., Limited of London, England v. United States, 2 Cir., 1955, 222 F.2d 75, 77. See also The Umbria, 1897, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Nacoochee, 1890, 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; The City Of Norfolk, 4 Cir., 1920, 266 F. 641, 645.

I find that the Nonsuco was at fault.

The foregoing shall constitute Findings of Fact and Conclusions of Law in accordance with Admiralty Rule 46½, 28 U.S.C.A.

It is

Ordered, Adjudged and Decreed that the cross-libellant herein recover of and from the cross-respondent the damages sustained by it in consequence of the matters referred to in the cross-libel; and it is further

Ordered, that it is hereby referred to Helen F. Tuohy, Esq., as Commissioner, to hear proofs as to the cross-libellant's damages herein, and to report to this Court her conclusions thereon with all convenient speed.